# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARA REYES, *on behalf of herself and those similarly situated and the State of California*,<br><br>Plaintiff,<br><br>v.<br><br>GROW SMART LABOR, INC., et al.,<br><br>Defendants. | Case No. 1:24-cv-00028-JLT-SAB<br><br>FINDINGS AND RECOMMENDATIONS RECOMMENDING DENYING PLAINTIFF'S MOTION TO CERTIFY CLASS<br><br>(ECF No. 62)<br><br>**OBJECTIONS DUE WITHIN FOURTEEN DAYS** |

Pending before the Court is the motion to certify class filed by Plaintiff Sara Reyes. This is a putative class action involving alleged wage-and-hour violations committed by Defendants Grow Smart Labor, Inc., Pedro Arellano-Moya, and Jorge Esteban Fuentes (collectively, "Defendants"). Proposed class representative and lead Plaintiff Sara Reyes ("Plaintiff"), who was employed by Grow Smart Inc. in August 2023, moves for class certification. Defendants argue that Plaintiff has failed to meet the requirements of Federal Rules of Civil Procedure 23(a) and 23(b). Motions for class certification are automatically referred to the assigned magistrate judge, pursuant to the District Judge's Standing Order.

The Court held a hearing on June 24, 2026. Cody Bolce, Esq., appeared on behalf of Plaintiff. Ryan Porte, Esq., appeared on behalf of Defendants. Having considered the moving papers, submitted evidence, and arguments by counsel, as well as the Court's file, the Court issues the following findings and recommendations recommending denying Plaintiff's motion.

# I.

# BACKGROUND

Grow Smart Labor, Inc., ("Grow Smart") is a registered Farm Labor Contractor that hires agricultural workers to plant, cultivate, and harvest strawberries, grapes, and other agricultural products for third-party contractees who operate farms, vineyards, packing operations, and other agricultural worksites (ECF No. 62-5, Deposition of Pedro Arellano-Moya, May 20, 2025 ("Arellano-Moya Dep."), 9:17-10:5, 10:19-23; ECF No. 63-6, Declaration of Pedro Arellano-Moya dated May 27, 2026 ("Arellano-Moya Decl."), ¶ 3; ECF No. 63-14, Declaration of Jorge Esteban Fuentes dated May 27, 2026 ("Fuentes Decl."), ¶ 3.) Grow Smart began operations on or about June 15, 2023. (ECF No. 63-6, Arellano-Moya Decl., ¶ 3; ECF No. 63-14, Fuentes Decl., ¶ 3; see ECF No. 62-5, Arellano-Moya Dep., 9:2.) Grow Smart does not own or farm its own land. (Id.; see ECF No. 62-5, Arellano-Moya Dep., 9:17-10:19-23.) Its work is seasonal and varies widely depending on contractee needs, crop, location, assignment, and season. (ECF No. 63-6, Arellano-Moya Decl., ¶ 4; see ECF No. 62-5, Arellano-Moya Dep., 9:17-10:19-23.) At certain points during "high season," Grow Smart has employed up to approximately 200 employees at one time, while at other times the number of employees is substantially lower. (Id.)

Grow Smart assigns employees to different contractees, who have differing locations, crops, job duties, and supervisors. (ECF No. 63-6, Arellano-Moya Decl., ¶¶ 5, 18, 25.) Thus, employees' schedules, worksites, supervisors, timekeeping formats, and pay methods can vary depending on the assignment. (ECF No. 63-6, Arellano-Moya Decl., ¶¶ 5, 17-18, 25; ECF No. 63-15, Declaration of Alica Torres dated May 27, 2026, ("Torres Decl."), ¶¶ 4-7, 13.) Most Grow Smart employees are paid hourly, while a smaller percentage, approximately 15 to 20 percent, are paid on a "piece-rate basis" depending on the contractee, crop, and assignment. (ECF No. 63-6, Arellano-Moya Decl., ¶ 6; ECF No. 63-14, Fuentes Decl., ¶ 5; ECF No. 63-4, Deposition of Lisandra Ruiz dated May 20, 2025 ("Ruiz Dep.") 30:2-5.)

Grow Smart uses different types of time records depending on the assignment, contractee, and work being performed. (ECF No. 63-6, Arellano-Moya Decl., ¶¶ 14, 17-18; see, e.g., ECF

Nos. 63-11.) Some assignments use crew timecards, while other assignments use individual timecards. (ECF No. 63-6, Arellano-Moya Decl., ¶¶ 14, 17-18; ECF No. 63-15, Torres Decl., ¶ 6.) Therefore, some records include crew-level notations regarding rest breaks and meal periods, while other records include individual start times, stop times, meal entries, and employee signatures. (ECF No. 63-6, Arellano-Moya Decl., ¶¶ 17-18, 22; ECF No. 63-15, Torres Decl., ¶ 6; see ECF No. 63-8 .) For crew work, Grow Smart supervisors or crew leaders generally direct crews when to take rest breaks and meal periods. (ECF No. 63-6, Arellano-Moya Decl., ¶ 19.) When crews take meal periods, operations generally cease for the crew, and employees are not instructed to continue working during meal or rest periods. (Id.)

Some Grow Smart crew timecards include a notation such as "15/30/15" box or similar entries reflecting rest-break and meal-period information for the crew. (ECF No. 63-6, Arellano-Moya Decl., ¶¶ 18, 22; see ECF No. 63-8.) In Grow Smart's timekeeping records, the "15/30/15" notation with check-marked boxes reflects that employees were provided two rest breaks and a meal period during the workday. (ECF No. 63-6, Arellano-Moya Decl., ¶ 22; see ECF Nos. 63-11.) Thus, on crew assignments, the absence of an individual meal punch does not automatically mean the employee was denied a meal period because, in many crew settings, the crew may have stopped work together for meal periods. (ECF No. 63-6, Arellano-Moya Decl., ¶¶ 19, 22; ECF No. 63-15, Torres Decl., ¶¶ 14-17.)

In August 2023, Grow Smart employed Plaintiff as a grape picker and packer for eight shifts, assigned to non-party Five Diamond Cold Storage, Inc. ("Five Diamond"), in Delano, California.[1] (ECF No. 62-4, Declaration of Sara Reyes dated May 12, 2026 ("Reyes Decl."), ¶ 2; ECF No. 63-6, Arellano-Moya Decl., ¶¶ 7, 14.) Plaintiff's duties involved picking and packing grapes, building boxes used to transport grapes, placing numbers on the boxes, and weighing boxes of grapes. (ECF No. 62-4, Reyes Decl.,¶ 3.) Grow Smart expected its workers to fill

[1] The Court notes that Plaintiff initially named Five Diamond as a defendant in this case. On August 2, 2024, Plaintiff's counsel and Defendants' former counsel stipulated to dismiss Five Diamond without prejudice and further stipulated that the statute of limitations for Plaintiff's claims against Five Diamond would be tolled until termination of this action. (ECF No. 31.) The Court entered an order directing the Clerk to terminate Five Diamond as a defendant on August 5, 2024. (ECF No. 32.) Plaintiff has not named any other Grow Smart contractee as a defendant.

between 35 and 40 boxes of grapes per day, while they worked outside in the sun. (Id.) Plaintiff worked only on a Five Diamond grape-related assignment and only on a piece-rate basis, and only under supervisor, Irais Mata. (ECF No. 63-6, Arellano-Moya Decl., ¶ 7; ECF No. 62-4, Reyes Decl., ¶¶ 2-3, 7-6.) From approximately August 2023 through October 2023, Grow Smart assigned approximately 60 employees to work at Five Diamond, all of whom were paid on a piece-rate basis. (ECF No. 63-6, Arellano-Moya Decl., ¶ 8.)

Plaintiff typically started work at approximately 7:00 a.m. and usually worked until approximately 2:00 p.m. or 2:30 p.m., though she worked overtime until approximately 3:30 p.m. on about three occasions. (ECF No. 62-4, Reyes Decl.,¶ 4.) She worked six days in the first week and three or four days in the second week. (Id.) When workers arrived, they signed in, but Plaintiff did not record the actual time she started working. (Id. at ¶ 5.) Rather, supervisors kept sign-in sheets in vehicles parked near the water jugs, where workers went to get water during the day. (Id.) Plaintiff did not sign out at the end of the workday and did not sign out for meal or rest period. (Id.)

Plaintiff was a non-exempt employee paid on a "piece-rate basis," meaning she was paid according to the number of grape boxes completed, at approximately $3.60 per box. (ECF No. 62-4, Reyes Decl.,¶¶ 6, 9.) Plaintiff kept track of the number of boxes she completed each day in a notepad because she noticed her paychecks were lower than they should have been. (Id.) According to Plaintiff's calculations, one of her paychecks was short by approximately $150. (Id.) Plaintiff's first paycheck bounced for insufficient funds. (Id.) Her second paycheck cashed, but the amount was still less than what Plaintiff believed she was owed. (Id.) Plaintiff reported these issues to her supervisor, Irais Mata, who worked for Grow Smart. (Id. at ¶ 7.)

When working for Grow Smart, Plaintiff was occasionally able to take approximately ten minutes to eat, but she could not sit down because she had to work while eating. (Id. at ¶ 8.) Grow Smart supervisors instructed Plaintiff and other employees not to take meal periods or rest breaks. (Id.) Instead, supervisors told Plaintiff and other employees to hurry up and continue working without taking breaks. (Id.) Because of the pressure to complete a large number of grape boxes each day, Plaintiff worked through her shifts without uninterrupted meal periods or

rest breaks. (Id.) Plaintiff did not receive premium pay for missed meal periods or rest breaks. (Id.)

Plaintiff was not compensated separately for her rest periods (when they were provided) or other nonproductive time. (Id. at ¶ 9; see ECF No. 62-2, Declaration and Expert Report of Aaron Woolfson dated February 13, 2026 ("Woolfson Report"), ¶ 50.) For example, Plaintiff's wage statement for the pay period from August 20, 2023, to August 26, 2023, shows 85 pieces paid at a rate of $3.00 and 25 pieces at a rate of $2.75 for a total gross pay of $323.75. (ECF No, 62-4, Reyes Decl., p. 6; ECF No. 63-10.) The statement does not include any separate payment for rest periods or other nonproductive time. (Id.)

After Plaintiff's employment ended, Grow Smart's piece-rate payroll accounting system was updated beginning in September 2023 to include separate break/rest pay for piece-rate workers. (ECF No. 63-6. Arellano-Moya Decl., ¶ 23, citing ECF No. 63-12; ECF No. 63-14, Fuentes Decl., ¶ 8.) Grow Smart's payroll records and wage statements differ depending on whether the employee was paid hourly or piece-rate and depending on the pay period at issue. (ECF No. 63-14, Fuentes Decl., ¶¶ 4-8; ECF No. 63-15, Torres Decl., ¶¶ 4-7.)

Beginning in or around March 2024, Grow Smart implemented a written onboarding and policy acknowledgment packet for employees. (ECF No. 63-6, Arellano-Moya Decl., ¶¶ 11-12, citing ECF No. 63-8.) The packet included written policies addressing meal and rest periods, nonproductive time, tools and equipment, and dispute resolution, including an arbitration agreement with a class action waiver. (ECF No. 63-6, Arellano-Moya Decl., ¶¶ 11-12, citing ECF No. 63-8.) To Pedro Arellano-Moya's knowledge, Chief Executive Officer of Grow Smart, all employees hired after implementation of the packet in March 2024 have executed the arbitration agreement as part of their onboarding paperwork. (ECF No. 63-6, Arellano-Moya Decl., ¶ 11.)

Grow Smart has produced exemplar signed policy sets representative of signed policy sets executed by 51 Grow Smart employees. (ECF No. 63-6, Arellano-Moya Decl., ¶ 12, citing ECF No. 63-8.) The policy sets include signed acknowledgments of Grow Smart's meal and rest period policy, nonproductive-time policy, tools and equipment policy, and arbitration agreement.

(Id.) Grow Smart has also produced declarations by employees demonstrating that these employees were allowed to take rest breaks and meal periods, that crews generally stopped working together for meal periods, that these employees were not told to work through meal periods or rest breaks, and that these employees understood they could report issues with pay, meal periods, or rest breaks. (ECF No. 63-6, Arellano-Moya Decl., ¶ 24, citing ECF No. 63-13; see also ECF No. 63-15, Torres Decl., ¶¶ 11-12, 14-17.)

On January 5, 2024, Plaintiff commenced this putative class action. (ECF No. 1.) As relevant here, on July 22, 2024, Plaintiff filed her second amended complaint bringing eight causes of action: 1) violation of the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. § 1801, *et seq.*; 2) failure to record and compensate nonproductive time separate from any piece-rate compensation, Cal. Labor Code § 226.2; 3) failure to provide proper meal periods or compensation in lieu thereof, Cal. Labor Code §§ 226.7, 512, and applicable IWC wage order; 4) failure to pay minimum wages, Cal. Labor Code §§ 1194, 1194.2, 1197(A), and applicable IWC wage order; 5) waiting time penalty, Cal. Labor Code §§ 201, 202, 203; 6) failure to provide accurate itemized wage statements, Cal. Labor Code §§ 226, 226.2, and IWC Order; 7) violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; 8) penalties and wages for violations pursuant to Cal. Labor Code §§ 2698, *et seq.*, 558, and 558.1. (ECF No. 30.)

Defendants answered (ECF No. 33), and the Court held an initial scheduling conference and determined to employ phased discovery in this matter, with the first phase focused on leading to a motion for class certification. (ECF No. 36.) Following litigation not relevant here, on May 14, 2026, Plaintiff filed her motion to certify class, which has been fully briefed. (ECF Nos. 62, 63, 64.) On June 24, 2026, the Court held a hearing on the matter. (ECF No. 66.)

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs class actions. See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 663-64 (9th Cir. 2022) (en banc). "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis,'" that the

requirements of Rule 23 are met. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350-51 (2011), quoting Gen. Tel. Co. of SW v. Falcon, 457 U.S. 147, 161 (1982). Rule 23 is more than "a mere pleading standard; plaintiffs cannot plead their way to class certification through just allegations and assertions." Small v. Allianz Life Insurance Company of North America, 122 F.4th 1182, 1197 (9th Cir. 2024), quoting Black Lives Matter L.A. v. City of L.A., 113 F.4th 1249, 1258 (9th Cir. 2024). Rather, "plaintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." Olean, 31 F.4th at 665.

In this regard, a plaintiff "must make two showings" to certify its purported class. Id. at 663. "First, the plaintiffs must establish 'there are questions of law or fact in common to the class,' as well as demonstrate numerosity, typicality, and adequacy of representation." Id., quoting Fed. R. Civ. Proc. 23(a). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" and the "claims must depend upon a common contention." Wal-Mart, 564 U.S. at 349-50, quoting Falcon, 457 U.S. at 157.

"Second, the plaintiffs must show that the class fits into one of three categories" as provided in Rule 23(b). Olean, 31 F.4th at 663. As relevant here, pursuant to Rule 23(b)(2), a class may be certified "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). And under Rule 23(b)(3), a class may be certified if "questions of law or fact common to class members predominate over the questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[P]laintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence. In carrying the burden of proving facts necessary for certifying a class under Rule 23(b)(3), plaintiffs may use any admissible evidence." Olean, 31 F.4th at 665, citing Tyson Foods v. Bouaphakeo, 577 U.S. 442, 454-55 (2016). While the class-certification analysis "may entail some overlap with the merits of the plaintiff's underlying claim, Rule 23 grants courts no license to engage in free-ranging

merits inquiries at the certification stage." Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 465-66 (2013) (internal citations and quotation marks omitted). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Id. (citation omitted); see also In re JUUL Labs, Inc. Antitrust Litigation, No. 20-cv-02345-WHO, 2026 WL 539344, at *1 (N.D Cal. Feb. 26, 2026).

## III.

## DISCUSSION

Plaintiff moves to certify a global class, as well as six subclasses. (ECF No. 62, pp. 9-10.) In support of class certification, Plaintiff argues that she meets Federal Rule of Civil Procedure Rule 23(a), as well as both Rule 23(b)(2) and Rule 23(b)(3). (Id. at pp. 7-13.) Defendants oppose, first by making evidentiary objections to Plaintiff's proffered evidence. (ECF No. 63-1.) Thereafter, Defendants explain that, in their view, Plaintiff has failed to prove compliance with Rule 23 by preponderance of the evidence, and therefore, class certification should be denied. (ECF No. 63, pp. 8-21.)

Before turning to whether Plaintiff has met her burden under Rule 23, the Court outlines the proposed classes and addresses Defendants' evidentiary objections.

### A. The Proposed Classes

Plaintiff proposes the following global class and six subclasses.

> **Global Class:**
> All non-exempt agricultural employees employed by any Defendant at any time from January 5, 2021 to the present.
>
> **Short, Untimely, Incomplete or Missed Meal Period Subclass:**
> All non-exempt agricultural employees employed by any Defendant at any time from January 5, 2021 to the present who worked at least one shift of 5 hours or greater.
>
> **Auto-Deduct Subclass:**
> All non-exempt agricultural employees employed by any Defendant at any time from January 5, 2021 to the present who worked at least one shift greater than 6 hours and had 30 minutes of pay automatically deducted for a meal period.
>
> **Piece-rate Subclass (Labor Code § 226.2):**
> All non-exempt agricultural employees employed by any

> Defendant at any time from January 5, 2021 to the present who were not compensated separately for rest periods or other non-productive time.
>
> **<u>Wage Statement Subclass (Labor Code § 226):</u>**
> All non-exempt agricultural employees employed by any Defendant at any time from January 5, 2023 to the present to whom any Defendant issued an inaccurate wage statement.
>
> **<u>Waiting Time Penalties Subclass (Labor Code § 203):</u>**
> All non-exempt agricultural employees employed by any Defendant at any time from January 5, 2021 to the present who were not paid all wages owed at the time of separation of employment.
>
> **<u>Violation of Unfair Competition Law Subclass:</u>**
> All non-exempt agricultural employees employed by any Defendant at any time from January 5, 2020 to the present who, due to the violations alleged in the subclasses, were subject to unlawful or unfair business acts or practices.

(ECF No. 62, pp. 3-4.)

**B. Defendants' Evidentiary Objections**

Defendants make seven evidentiary objections to three pieces of evidence proffered by Plaintiff in support of her motion to certify class. (ECF No. 63-1.) The Court has searched Plaintiff's reply, but it does not appear that Plaintiff responded to Defendants' objections. At the hearing, Plaintiff confirmed that she did not oppose the objections and maintained that notwithstanding the objections, class certification should still be granted.

**a. Declaration of Attorney Stan Mallison**

Defendants make two related objections to the declaration of Stan Mallison, attorney for Plaintiff. (ECF No. 63-1, pp. 2-3.)

**<u>OBJECTION No. 1</u>**

Defendants take issue that in Mallison's declaration, ¶ 9, wherein Mallison states that Plaintiff

> brings this action on behalf of herself and her fellow workers to challenge Defendant's unlawful employment policies. Defendant employed Plaintiff and class members as non-exempt agricultural workers. Plaintiff and class members report Defendant failed to provide compliant meal periods, auto-deducted meal periods, and did not pay separately for rest periods and other non-productive time.

(ECF No. 62-1, Declaration of Stan S. Mallison dated May 14, 2026 ("Mallison Decl."), ¶ 9.)

Defendants object on the grounds that these statements lack foundation and are not based on personal knowledge, citing Fed. R. Evid. 602. Defendants further object that these statements are speculative, hearsay, improper legal conclusion, and attorney argument, citing Fed. R. Evid. 602, 801, 802. (ECF No. 62-1, p. 2.)

In support, Defendants argue that Mallison is Plaintiff's attorney and has not established that he personally observed Grow Smart in any of its operations of practices. Further, Defendants note that this statement assumes Defendants engaged in unlawful behavior, which is essentially attorney argument with legal conclusions. Finally, to the extent this statement relies on reports by Plaintiff or putative class members, the statement is hearsay.

The Court agrees and SUSTAINS the objection.

**<u>OBJECTION No. 2</u>**

Defendants next take issue with the following statement from ¶ 12, wherein Mallison declared:

> This case presents no manageability difficulties that would preclude class certification. The case will be easily manageable at trial. After all, liability can be determined largely based on Defendant's business records, which Defendant has produced to Plaintiff. Facts as to what those data show will be established by limited expert testimony.

(ECF No. 62-1, Mallison Decl., ¶ 12.)

Defendants object that this statement lacks foundation, Fed. R. Evid. 602, and is speculative, contains an improper legal conclusion, and is attorney argument. Fed. R. Evid. 602, 801, 802. (ECF No. 63-1, p. 2.)

In support, Defendants contend that because Mallison has not established that he personally observed Grow Smart's operations and practices, Mallison has failed to lay a foundation to speak on whether liability can be best established through common proof. Defendants further observe that statement assumes, without a non-speculative factual foundation, that this case presents no manageability difficulties, that liability can be determined largely from Defendants' business records, and that limited expert testimony will be sufficient to establish the

relevant facts. Thus, Defendants argue the statement contains attorney argument with legal conclusions regarding manageability, predominance, superiority, and whether Plaintiff can establish liability through common proof under Rule 23.

The Court agrees and SUSTAINS the objection.

**b. Expert Report of Aaron Woolfson**

Defendants make four objections to the declaration and expert report by Arron Woolfson, Plaintiff's proffered expert. (ECF No. 63-1, pp. 3-6.)

A court "evaluating challenged expert testimony in support of class certification . . . should evaluate admissibility under the standard set forth in Daubert." Sali v. Corona Reg'l Med. Ctr., 909 F.3d 996, 1006 (9th Cir. 2018). "Under Daubert, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." Ellis v. Costco Wholesale Corp., 657 F.3d 970, 982 (9th Cir. 2011). At the class certification stage, however, "admissibility must not be dispositive. Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at th[is] stage." Sali, 909 F.3d at 1006. A court's "analysis [is] tailored to whether an expert's opinion was sufficiently reliable to admit for the purpose of proving or disproving Rule 23 criteria, such as commonality and predominance." Tait v. BSH Home Appliances Corp., 289 F.R.D. 466, 495 (C.D. Cal. 2012). In doing so, the "requirements of relevance and reliability set forth in Daubert . . . serve as useful guideposts but the court retains discretion in determining how to test reliability as well as which expert's testimony is both relevant and reliable." Id. (internal quotation marks omitted). At this stage, courts consider only "if expert evidence is useful in evaluating whether class certification requirements have been met." Id. (internal quotation marks omitted); see Lytle v. Nutramax Laboratories, Inc., 114 F.4th 1011, 1030-31 (9th Cir. 2024) (observing that the Daubert analysis employed for class certification remains flexible depending on factors such as context and procedural posture).[2]

---

[2] Beyond the objections discussed herein, Defendants do not otherwise contend that Woolfson is not an expert under Daubert.

**OBJECTION No. 3**

Defendants object to Woolfson Report ¶ 44's conclusions regarding shifts with "No Recorded Lunch Periods" and ¶ 46's heading "Meal Violations (De-duplicated)" and related conclusions characterizing shifts as meal-period violations. (ECF No. 62-2, Woolfson Report, ¶¶ 44, 46.) Defendants object for lack of foundation, speculation, unreliable expert opinion, improper conclusion, misleading, and insufficient factual basis, citing Fed. R. Evid. 602, 702, 703. (ECF No. 63-1, p. 3.)

In support, Defendants argue that while Woolfson's calculations may identify records in which no numerical meal entry appears, Woolfson has not established a reliable factual basis to conclude that meal periods were not actually provided, that crews did not stop working together, that employees were not relieved of duty, that meal periods were not recorded at the crew level, or that any employee was in fact denied a meal period.

Defendants further assert that the evidence is unreliable expert opinion because it uses the absence of recorded meal entries to infer class-wide meal-period violations without accounting for different timekeeping formats, crew timecards, individual timecards, contractee assignments, supervisors, or operational context of agricultural workers.

Defendants' final objection to this evidence is an improper legal conclusion because the heading "Meal Violations (De-duplicated)" and related conclusions characterize data flags as legal violations, even though Woolfson testified he was not retained to determine legal standards or their applicability and his opinions are limited to the "four corners" of the data he analyzed. (ECF No. 63-3, Woolfson Dep., 30:18-31:2.)

The Court has reviewed the Woolfson Report, as well as the deposition of Woolfson, and overall agrees with Defendants. To begin with, the Court observes that Woolfson has over 20 years of experience in creating databases and integrating them with computerized information delivery systems, such as telephone systems, email platforms, and time keeping systems. (ECF No. 62-2, ¶ 17.) Woolfson has also provided expert testimony in many cases involving data of payroll, time shifts, as well as meal and rest breaks. (Id. at ¶¶ 7-16.) Plaintiff relies on Woolfson's opinion to support her contention that Defendants failed to provide meal periods and

rest breaks.

Next, to aid the analysis (as well as further objections below), the Court quotes the relevant deposition testimony of Woolfson:

> Q. Okay. Let's see. Okay. So your retention here does have limits. You were not retained in this matter to determine the legal standards of any court decisions or any applicability in the case, correct?
>
> A. Correct.
>
> Q. All right. And then your opinions are informed exclusively within the four corners of the data that you analyzed?
>
> A. Correct.

(ECF No. 63-3, Woolfson Dep., 30:18-31:2.)

> Q. Okay. The QuickBooks file didn't specify capture the punch-in and punch-out times for the times the employees actually worked, right?
>
> A. That is correct.

(Id. at 40:13-40:16.)

> Q. Yeah. So [you] already established that the QuickBooks data is hours only, And I'm just confirmed that the QuickBooks data didn't include punch-in and punch-out times, correct?
>
> A. Not that I was aware of. No.

(Id. at 40:24-41:2.)

> Q. All right. Did you ever – did you review Gross Smart's other timekeeping procedures?
>
> A. No.
>
> Q. What about their rest break procedures?
>
> A. No. . . .

(Id. at 41:20-24.)

> Q. Have you – did you ever review the company's handbook?
>
> A. No.
>
> Q. All right. And you never reviewed the company's meal policy, did you?
>
> A. No.

(Id. at 42:9-14.)

> Q. Okay. So I wanted to ask – you've seen these worksheets, the hourly time sheets, and you incorporated an example into your report?
>
> A. Correct.
>
> Q. I'll zoom this up here. Did you analyze what this box in the upper left-hand corner signifies?
>
> A. No.
>
> Q. Can you read that? I can flip it for you and we can zoom it in.
>
> A. Well, it says the weekdays and it says 15, 30, and 15.
>
> Q. And we – then we got checkmarks.
>
> A. Yes, but remember, it's the recordation of a meal break that I'm looking for and the measurement of that time. It's not whether there's a checkbox somewhere, but there needs to be, from my understanding, a recordation of the time. And that's what I'm being asked to look at. Is there a recordation of time or not?
>
> Q. Okay. So, I mean, in your opinion, with 15, 30, 15, can you give me an opinion as to what this may signify?
>
> A. Well, it – I think it signifies that the employee or the employer, foremen or somebody checkmarked that they allegedly received some sort of meal maybe.
>
> * * *
>
> A. . . . my job is to indicate or was to analyze whether there was presence of a meal as indicated by a 30-minute meal period in the data according to the time.

(Id. at 50:10-51:8, 51:15-18.)

> Q. Okay. So if during your analysis, if you don't see a – some sort of time indicator showing that an employee took a 30-minute meal period, that to you, according to your analysis, is a meal period in which there's no data, correct?
>
> PLAINTIFF'S ATTORNEY: Objection. Misstates testimony.
>
> A. Yeah. . . . My job is just simply to say how many of these shifts do not have a recorded – a recordation of time indicating a meal period by which I can either measure one took place and when it took place and how long it was.

(Id. at 52:25-53:5, 53:10-13.)

> Q. Right. Now, in looking at this upper left-hand box, somebody indicated there was a 15-minute, 30-minute, and 15-minute – or somebody indicated Monday through Friday with boxes checked and then 15, 30, 15.
>
> And I'm just asking what is your opinion of what that box signifies?
>
> A. Well, my opinion is –
>
> PLAINTIFF'S ATTORNEY: Objection. Outside the scope.
>
> A. – signifies that somebody put a check box in a chart specifying that there was a 30-minute deducted for what I presume was maybe a meal, but that's a legal conclusion. I can't really say if that represents a meal or not.

(Id. at 54:21-55:8.)

> Q. You're not personally familiar with, you know, the day-to-day activities performed by employees of a farm-labor contractor, correct?
>
> A. I'm not. It would vary, you know, from – you know, between different beneficiaries of that employment contract.
>
> Q. Okay. And are you familiar with wage order 14?
>
> A. Probably the content of it, but I mean, I am not familiar with it by simply saying "wage order 14."
>
> * * *
>
> Q. Yeah. Okay. So, I mean, you wouldn't be familiar with the wage order 14 section 7, which section 7(a)(3), which provides an exception for when meal periods need to be recorded in agricultural situations?
>
> A. No.
>
> PLAINTIFF'S ATTORNEY: Objection. Calls for legal conclusion.
>
> Not – yeah. I'm not familiar with that. That's not something that ever came up in GMR or –
>
> Q. Yeah.
>
> A. – any of the other cases in which I've worked.

(Id. at 55:24-56:6, 56:22-57:8.)

> Q. Yeah. The original question was whether or not you know whether it's a requirement for California employers to report rest breaks? Just yes or no, I don't know.

PLAINTIFF'S ATTORNEY: Same objection. Calls for legal conclusion.

A. I don't know.

(Id. at 66:7-12.)

Q. All right. Okay. But your database doesn't have information regarding instances – or instances where an employee may have voluntarily waived a meal break, correct?

A. I did not see anything like that.

Q. Okay. And it doesn't contain any data where an employee may have voluntarily waived a rest period, correct?

A. I don't think I saw anything like that, no.

Q. Okay. And similarly, the analysis doesn't – doesn't take into account any instance where an employee was provided with a meal period, but chose not to take it for whatever reason?

A. Right. I mean, there could be any number of extrinsic data points that are not within the four square corners of the data, but I'm only relying upon that which is in the data itself.

Q. Okay. And the data can't necessarily tell us whether any violation actually occurred for any specific employee on any specific day, correct?

PLAINTIFF'S ATTORNEY: Objection. Calls for legal conclusion.

A. Well, I mean, I think the constituent shifts themselves indicate whether or not meals were present or not. Each –

Q. Well, no. We talked about how the data analysis captures whether or not a meal period was recorded or not. But it doesn't capture whether or not a meal period or rest break was actually taken or not, right?

PLAINTIFF'S ATTORNEY: Objection. Calls for legal conclusion.

A. Right. The recordation of that time or the presence thereof is all that was done, but there's no extrinsic data that I'm aware of or data that was available or wasn't provided that would have been incorporated.

(Id. at 71:20-73:4.)

Q. Yeah. But the fact that a meal period wasn't specifically recorded in your data doesn't rule out the potential for that meal period to have actually been given, correct?

> A. I see what you're saying.
>
> PLAINTIFF'S ATTORNEY: Calls for a legal conclusion.
>
> A. Yeah, that's a legal conclusion. I can't state either way, but the data is certainly not – there's nothing indicative of it being either way within the data.

(Id. at 73:13-22.)

> Q. You're focused on the four corners of the data. You don't have an opinion as to whether or not an additional analysis needs to – regarding individual employees need to be conducted, correct?
>
> A. I don't have any opinion either way.

(Id. at 74:13-17.)

In addition to the deposition of Woolfson, Defendants have directed the Court to Industrial Welfare Commission ("IWC") Order No. 14-2001 Regulating Wages, Hours and Working Conditions in the Agricultural Occupations.[3] (ECF No. 63-5.) Under a heading labeled "Records," the following, in relevant part, is provided:

> Time records showing when the employee begins and ends each work period. Meal periods, split shift intervals and total daily hours worked shall also be recorded. **Meal periods during which operations cease and authorized rest periods need not be recorded.**

California Industrial Welfare Commission (IWC) wage order No. 14-2001, § 7(A)(3) ("Wage Order No. 14") (emphasis added); see also Cal. Code Regs. tit. 8, § 11140.

Based on the testimony of Woolfson, Wage Order No. 14, and Woolfson's report (ECF No. 62-3, Woolfson Report), the Court agrees with Defendants that though Woolfson's conclusions identify records which contain no *numerically entered* meal breaks, Woolfson has not provided a factual basis to conclude whether meal periods were actually given or not. For example, the Court is particularly struck by Woolfson's testimony regarding the "15/30/15" boxes on various time sheets, including one example cited by Woolfson in his report, (id. at ¶ 29), which Woolfson himself admitted could represent "maybe a meal." (ECF No. 63-3,

---

[3] "The IWC's wage orders are to be accorded the same dignity as statutes. They are 'presumptively valid' legislative regulations of the employment relationship, regulations that must be given 'independent effect' separate and apart from any statutory enactments." Donohue v. AMN Services, LLC, 11 Cal. 5th 58, 66, 481 P.3d 661 (Cal. 2021) (internal citations omitted).

Woolfson Dep., 55:6.)

Woolfson also explained that he had limited his analysis to "[t]he recordation of that time or the presence thereof is all that was done." When asked if the data he had reviewed definitively ruled out the potential for meal periods to have actually been given otherwise (beyond the numerically entered data), Woolfson responded, "I can't state either way, but the data is certainly not – there's nothing indicative of it being either way within the data."

In addition, the Court observes that Wage Order No. 14 explicitly does not require employers of agricultural workers to record meal breaks "during which operations cease" (or authorized rest periods at all). Woolfson testified that he was familiar "[p]robably the content of [Wage Order No. 14]" but admitted he was not familiar with "section 7(a)(3), which provides an exception for when meal periods need to be recorded in agricultural situations." Yet, this context appears to be critical in assessing time records of agricultural occupations.

Thus, the Court agrees with Defendants that by limiting himself to numerically entered information (which Wage Order No. 14 does not necessarily require), Woolfson has seemingly based certain conclusions on the absence of evidence, which is compounded by the fact that Grow Smart, and its contractees, utilize different timekeeping formats, crew timecards, individual timecards, contractee assignments, supervisors, and operational contexts—none of which appears to have been accounted for in the Woolfson Report.

Finally, the Court agrees with Defendants that ¶ 46, labeled as "Meal Violations (De-duplicated)," contains what appears to be legal conclusions insofar as these conclusions purport to be a legal violations.

Thus, the Court agrees with Defendants' arguments made in this objection, and the Court will consider this expert evidence insofar as it is useful in evaluating whether class certification requirements have been met. See Lytle, 114 F.4th at 1031.

**Objection No. 4**

In the Woolfson Report, Defendants object to ¶¶ 27-28 generally and specifically to Woolfson's statements that "a meal is simply an unpaid thirty minutes of time from the timeclock" and that worked hours are calculated by subtracting thirty minutes from the day's

time. (ECF No. 62-2, Woolfson Report, ¶¶ 27-28.) Defendants object for lack of foundation, speculation, unreliable expert opinion, assumes facts not in evidence, misleading, and insufficient factual basis, citing Fed. R. Evid. 602, 702, 703. (ECF No. 63-1, p. 4.)

In support, Defendants contend that Woolfson did not establish a reliable factual basis to conclude from ¶¶ 27, 28 (or elsewhere) that any 30-minute entry or difference reflects an automatic deduction or that a meal period was not actually provided. To be sure, Woolfson's analysis identifies what appears certain times and payroll records. Significantly, however, the Court notes that the analysis did not include what occurred in the field, whether employees worked under a crew or individual timekeeping formats, whether operations ceased for the crews, whether a meal period was provided, whether meal periods were recorded at the crew level, or what a particular notation (*i.e.*, 15/30/15 boxes with checkmarks) meant in context. This is significant because, as discussed above, Wage Order No. 14 does not require recording meal periods when operations cease or authorized rest periods. Wage Order No. 14 § 7(A)(3).

Relatedly, the Court agrees with Defendants that ¶¶ 27 and 28 use a mathematical difference in records to infer a meal-period practice without accounting for different timekeeping formats, crew timecards, individual timecards, contractee assignments, supervisors, or operational context. Thus, for similar reasons discussed in Objection No. 4, this inference appears to be based on insufficient facts or data. Fed. R. Evid. 702

With this understanding, the Court agrees with Defendants' arguments made in this objection, and the Court will consider this expert evidence insofar as it is useful in evaluating whether class certification requirements have been met. <u>See</u> <u>Lytle</u>, 114 F.4th at 1031.

**<u>OBJECTION No. 5</u>**

Defendants object to the following lines from ¶ 47: "There were no recorded rest breaks. I did not find any indication of rest premiums for rest breaks." (ECF No. 63-1, p. 5, quoting ECF No. 62-2, ¶ 47.) Defendants object based on lack of foundation, speculation, unreliable expert opinion, improper legal conclusion, assumes facts not in evidence, misleading, and insufficient factual basis, citing Fed. R. Evid. 602, 702, 703. Though Defendants agree that Woolfson may state that he did not identify numerically entered recorded rest breaks or rest premiums in the

data he reviewed, Defendants contend that Woolfson lacks an adequate foundation to infer that the rest breaks were not authorized, permitted, or taken.

Of course, as discussed above, Wage Order No. 14 does not require that authorized rest periods be recorded, with which Woodson admitted to not being familiar. Wage Order No. 14, § 7(A)(3). Moreover, the Court again observes that Woolfson has not established whether rest breaks were provided in the field, whether employees were authorized and permitted to take rest breaks, or whether any rest-period premium was legally owed. Indeed, Woolfson testified that he did not ask employees whether they were able to take meal or rest breaks.

Insofar as objected, the Court agrees with Defendants' arguments made in this objection, and the Court will consider this expert evidence insofar as it is useful in evaluating whether class certification requirements have been met. See Lytle, 114 F.4th at 1031.

**OBJECTION No. 6**

Defendants object to ¶ 49 generally and specifically as to the heading "Auto Deductions" and the conclusion where no meal start time was recorded, the indication that a meal "occurred" was "simply reflected as a deduction of time of thirty (30) minutes from those days' compensable hours." (ECF No. 63-1, p. 5.) Defendants object based on lack of foundation, speculation, unreliable expert opinion, improper legal conclusion, assumes facts not in evidence, and insufficient factual basis, citing Fed. R. Evid. 602, 702, 703.

In support, Defendants argue that Woolfson did not establish a reliable factual basis to conclude that Grow Smart maintained a uniform automatic deduction policy, that any 30-minute entry or difference was unlawful, or that the absence of an individual meal-start time means a meal period was not actually provided. Defendants contend the opinion does not account for the format of the timecards themselves, including timecards that contain meal-period and rest-break notations in the upper left-hand corner, such as "15/30/15" boxes, reflecting that meal and rest periods were provided. In addition, Woolfson testified that he did not analyze what the notation in the upper left-hand corner signified.

As with other objections to the Woolfson Report, Defendants again highlight the issues presented with Wage Order No. 14, which provides that "[m]eal periods during which operations

cease and authorized rest periods need not be recorded." Wage Order No. 14, § 7(A)(3). Finally, Defendants argue that the heading "Auto Deductions" and related conclusions also improperly assume the disputed premise of Plaintiff's subclass theory and exceed the scope of a database analysis.

The Court agrees with Defendants' arguments made in this objection, and the Court will consider this expert evidence insofar as it is useful in evaluating whether class certification requirements have been met. See Lytle, 114 F.4th at 1031.

**c. Declaration of Plaintiff Sara Reyes**

Defendants make one objection to Plaintiff Sara Reyes' declaration.

**OBJECTION No. 7**

Defendants object to ¶ 8 of Plaintiff's declaration, including statements that that Grow Smart did not provide legally compliant meal or rest breaks; that Grow Smart supervisors instructed Plaintiff and other employees not to take meal periods or rest breaks; that employees were told to continue working without breaks; and that Plaintiff was not paid premium pay for allegedly missed meal periods or rest breaks. (ECF No. 63-1, p. 6.) Defendants object based on lack of foundation and not based on personal knowledge, Fed. R. Evid. 602, and as speculative, improper lay opinion, and improper legal conclusion. Fed. R. Evid. 602, 701.

In support, Defendants begin by acknowledging that though Plaintiff may testify regarding her personal experience, she has not established personal knowledge of Grow Smart's companywide meal-period or rest-break practices, the experiences of other employees, or instructions allegedly given to employees other than herself. Defendants then observe that Plaintiff did not identify the specific supervisor, date, shift, location, recipient, or content of any specific instruction allegedly given to "other employees," and therefore the statement is vague. Moreover, the phrases "legally compliant" and "premium pay" are legal conclusions. Therefore, Defendants contend that ¶ 8 should be disregarded to the extent it purports to establish companywide practices, instructions to other employees, or legal violations.

While the Court agrees with the bulk of Defendants' objection on its face, there is one nuance the Court must address. Defendants agree that Plaintiff may testify to what she

personally experienced, which the Court believes includes her observations while working for Grow Smart. The Court has reviewed Plaintiff's declaration and notes that Plaintiff's statement includes observations that supervisors told her and other employees to not take meal periods or breaks. (ECF No. 62-4, Reyes Decl., ¶ 8.) The Court agrees with Defendants that, based on this alone, Plaintiff has not established a foundation to speak on company-wide policies. However, Plaintiff may still testify to what she personally witnessed occur to herself and nearby employees.

The Court otherwise agrees with Defendants' arguments and, with the above understanding, SUSTAINS the objection IN PART.

**C. Rule 23(a) Requirements**

**1. Numerosity**

Plaintiff argues that she has met the numerosity requirement because her subclasses and global class range from 160 to 1,067 members, respectively. (ECF No. 62, p. 8.) Defendants did not address numerosity in their opposition. In any event, the Court agrees with Plaintiff.

A proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). Joinder need not be impossible, as long as potential class members would suffer a strong litigation hardship or inconvenience if joinder were required. See Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913-14 (9th Cir. 1964). The numerosity requirement is not tied to any fixed numerical threshold—it "requires examination of the specific facts of each case and imposes no absolute limitations." Rannis v. Recchia, 380 Fed. Appx. 646, 651 (9th Cir. 2010) (mem.), quoting Gen. Tel. Co. of the Nw., Inc. v. EEOC, 446 U.S. 318, 330 (1980). Though, under certain circumstances, numerosity may be met with a class as low as 20 members, in the Ninth Circuit numerosity is generally met when a class includes at least 40 members. See id., citing Estate of Felts v. Genworth Life Ins. Co., 250 F.R.D. 512, 520 (W.D. Wash. 2008), and EEOC v. Kovacevich "5" Farms, No. CV-F-06-165, 2007 WL 1174444, at *21 (E.D. Cal. Apr. 19, 2007).

Here, Plaintiff's smallest subclass is proposed with around 160 members, and her global class is proposed with around 1,067 members. (See ECF No 62-2, Woolfson Report, ¶ 42.)

Because both of these numbers are in excess of 40, the Court finds that Plaintiff has met the numerosity requirement for her global class and all subclasses.

**2. Commonality**[4]

Plaintiff argues that there are common questions of law and fact and that these predominate over questions affecting individual class members. (ECF No. 62, p. 9.) In particular, Plaintiff rests much of her argument on California Supreme Court case, Donohue v. AMN Services, LLC, 11 Cal. 5th 58, 481 P.3d 661 (Cal. 2021), as well as certain conclusions from Woolfson's Report. (Id. at pp. 9-10.) Defendants argue that, to start, Plaintiff has framed the commonality inquiry incorrectly and that differences in operations and timekeeping recording by various third-party clients renders Plaintiff's burden for commonality unmet. (ECF No. 63 pp. 8-9.) The Court agrees with Defendants.

In order for a plaintiff to "carry their burden of proving that a common question predominates, they must show that the common question relates to a central issue in the plaintiffs' claim." Olean, 31 F. 4th at 665, citing Wal-Mart, 564 U.S. at 349-50. "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" Wal-Mart, 564 U.S. at 349-50, quoting Falcon, 457 U.S. at 157. A plaintiff's "claims must depend upon a common contention . . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. at 350.

> What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

Id., quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 131-32 (2009).

[4] The Court is aware that the commonality and typicality requirements tend to merge into one another, General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 157 n.13 (1982), but, in any event, addresses the parties' arguments as presented in their briefing notwithstanding that some arguments could be analyzed under either commonality or typicality.

Here, Plaintiff outlines her argument first with her meal break violations, then her piece-rate violations, before acknowledging that claims such as wage statement claims and waiting time penalties are reliant on the meal break and piece rate violations. Defendants attack all of Plaintiff claims at once, arguing that Plaintiff has not proven that Grow Smart's operations or payroll/timekeeping records present common questions. Before addressing the arguments raised by the parties, the Court begins by recounting certain statutes listed in the operative complaint that are relevant to Plaintiff's meal break claims and piece-rate claims. See Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 819 (2011) ("Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action.").

Beginning with meal break violations, California Labor Code § 226.7 provides, in relevant part,

> An employer shall not require an employee to work during a meal or rest or recovery period mandated pursuant to an applicable statute, or applicable regulation, standard, or order of the Industrial Welfare Commission, the Occupational Safety and Health Standards Board, or the Division of Occupational Safety and Health.
>
> If an employer fails to provide an employee a meal or rest or recovery period in accordance with a state law, including, but not limited to, an applicable statute or applicable regulation, standard, or order of the Industrial Welfare Commission, the Occupational Safety and Health Standards Board, or the Division of Occupational Safety and Health, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recovery period is not provided.

Cal. Labor Code § 226.7(b), (c).

As relevant here, Wage Order No. 14 provides:

> An employer may not employ an employee for a work period of more than five (5) hours without providing the employee with a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of employer and employee. Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an 'on duty' meal period and counted as time worked. An 'on duty' meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by

> written agreement between the parties an on-the-job paid meal period is agreed to. . . .
>
> An employer may not employ an employee for a work period of more than ten (10) hours per day without providing the employee with a second meal period of not less than 30 minutes, except that if the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of the employer and the employee only if the first meal period was not waived.

Wage Order No. 14, § 11(A), (B); see also Cal. Labor Code § 512.

Turning to piece-rate violations, California Labor Code § 226.2 states:

> (a) For employees compensated on a piece-rate basis during a pay period, the following shall apply for that pay period:
>
> (1) Employees shall be compensated for rest and recovery periods and other nonproductive time separate from any piece-rate compensation.
>
> (2) The itemized statement required by subdivision (a) of Section 226 shall, in addition to the other items specified in that subdivision, separately state the following, to which the provisions of Section 226 shall also be applicable:
>
> (A) The total hours of compensable rest and recovery periods, the rate of compensation, and the gross wages paid for those periods during the pay period.
>
> (B) Except for employers paying compensation for other nonproductive time in accordance with paragraph (7), the total hours of other nonproductive time, as determined under paragraph (5), the rate of compensation, and the gross wages paid for that time during the pay period.
>
> (3)(A) Employees shall be compensated for rest and recovery periods at a regular hourly rate that is no less than the higher of:
>
> (i) An average hourly rate determined by dividing the total compensation for the workweek, exclusive of compensation for rest and recovery periods and any premium compensation for overtime, by the total hours worked during the workweek, exclusive of rest and recovery periods.
>
> (ii) The applicable minimum wage.

Cal. Labor Code § 226.2.

Finally, the statutory mechanism in the Labor Code that creates liability provides:

> Any employer or other person acting on behalf of an employer, who violates, or causes to be violated, any provision regulating minimum wages or hours and days of work in any order of the Industrial Welfare Commission, or violates, or causes to be

> violated, Sections 203, 226, 226.7, 1193.6, 1194, or 2802, may be held liable as the employer for such violation.

Cal. Labor Code § 558.1(a).

**a. Commonality: Meal Break Claims**

The Court begins analyzing commonality as to Plaintiff's meal-break claims and addresses Plaintiff's reliance on Donohue, which serves as the primary basis for commonality. Plaintiff argues that following Donohue, "there is a common presumption of liability for meal period violations running against Grow Smart in light of the meal period violations reflected in its timekeeping records." (ECF No. 62, p. 9.) Though Donohue creates a certain rebuttable presumption in specific circumstances, the Court is not persuaded Donohue necessarily applies here.

In Donohue, as relevant here, the California Supreme Court held that "time records showing noncompliant meal periods raise a rebuttable presumption of meal period violations, including at the summary judgment stage." 11 Cal. 5th at 61. However, as is generally the case, context matters. In Donohue, the defendant was a health care services and staffing company that recruited nurses for temporary contract assignments. Id. at 62. While the plaintiff worked for the defendant, she did not have a predetermined schedule but was expected to work eight hours per day with a 30-minute meal period beginning no later than the fifth hour of work. Id. In order to track timekeeping, the defendant employed a system that included a rounding of time feature. Id. "For example, if an employee clocked out for lunch at 11:02 a.m. and clocked in after lunch at 11:25 a.m., [the system] would have recorded the time punches as 11:00 a.m. and 11:30 a.m." Id. Thus, a 23-minute meal period could be recorded as a 30-minute meal period. Id.

Eventually, the plaintiff moved for summary adjudication, relying on the defendant's time records, the plaintiff's testimony, as well as an expert witness who was a statistics professor. Id. at 63-64. The expert compared the rounded time records with the actual time records, delineating violations like the 23-minute lunch example. Id. The defendant cross moved, arguing that it did not have a uniform policy or practice of denying employees compliant meal periods. Id. at 64. To support that, the defendant provided declarations from 40 class

members. Id. The defendant also provided an expert who opined that sometimes the timekeeping system's rounding feature favored the employees and sometimes it favored the defendant. Id. Critically, unlike the plaintiff's expert, "[the defendant's] expert did not account for meal period premium wages that would have been paid based on actual meal period times." Id. Though, the expert also opined that the system's rounding feature actually led to overcompensation to employees by 85 hours and that the average length of a meal period during the class period was 45.6 minutes. Id. The trial court granted the defendant's motion and denied the plaintiff's motion. Id. at 64-65. Specifically, the trial court found that the plaintiff had provided insufficient evidence that the defendant had a policy or practice of denying employees compliant meal periods. Id. The Court of Appeal affirmed, holding that the Labor Code and relevant wage order did not prohibit rounding. Id. at 65.

The California Supreme Court reversed. Regarding a rebuttable presumption involving time records showing noncompliant meal periods, the Donohue Court observed that such a presumption was first proposed in a concurrence where it was suggested that:

> If an employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided. This is consistent with the policy underlying the meal period recording requirement, which was inserted in the IWC's various wage orders to permit enforcement.

Id. at 74, quoting Brinker Restaurant Corp. v. Superior Court, 53 Cal. 4th 1004, 1053, 273 P.3d 513 (Cal. 2012) (Werdegar, J., concurring).

The Donohue Court, after observing what methods other Courts of Appeal had been employing, "adopt[ed] [Justice Werdegar's] discussion of the rebuttable presumption in full." Id. at 75. The Court also clarified that the issue of waiver of a meal period "is not an element that a plaintiff must disprove as part of the plaintiff's case-in-chief," but an affirmative defense for a defendant to raise. Id. at 75-76. The Court then rejected the defendant's attempt to limit the presumption to records showing only missed meal periods as opposed to records showing short or delayed meal periods. Id. at 76.

In support of its holding, the Donohue Court observed that:

> The presumption derives from an employer's duty to maintain accurate records of meal periods. It is important that employers keep accurate records so that enforcement agencies can 'adequately investigate and enforce' a wage order's meal period provisions. Because time records are required to be accurate, it makes sense to apply a rebuttable presumption of liability when records show noncompliant meal periods. If the records are accurate, then the records reflect an employer's true liability; applying the presumption would not adversely affect an employer that has complied with meal period requirements and has maintained accurate records. If the records are incomplete or inaccurate—for example, the records do not clearly indicate whether the employee chose to work during meal periods despite bona fide relief from duty—then the employer can offer evidence to rebut the presumption. It is appropriate to place the burden on the employer to plead and prove, as an affirmative defense, that it genuinely relieved employees from duty during meal periods. To place the burden elsewhere would offer an employer an incentive to avoid its recording duty and a potential windfall from the failure to record meal periods.

Id. (internal quotations and citations omitted).

In concluding its discussion, the Donohue Court made the following closing remarks:

> An employer is liable only if it does not provide an employee with the opportunity to take a compliant meal period. The employer is not liable if the employee chooses to take a short or delayed meal period or no meal period at all. The employer is not required to police meal periods to make sure no work is performed. Instead, the employer's duty is to ensure that it provides the employee with bona fide relief from duty and that this is accurately reflected in the employer's time records. Otherwise, the employer must pay the employee premium wages for any noncompliant meal period.

Id. at 78.

Applying the presumption to the case before it, the Donohue Court reversed the trial court's judgment and gave guidance on how to apply the presumption in the first instance. Id. at 79-80.

Here, the problem with Donohue is two-fold for Plaintiff. First, Donohue was decided in the context of Wage Order No. 4, which does not include the same recording exemption for meal and rest periods that Wange Order No. 14 includes. This is significant because Wage Order No. 14 states that "Meal periods during which operations cease and authorized rest periods need not be recorded." Wage Order No. 14, § 7(A)(3). In other words, timekeeping records in the context of agricultural workers, Wage Order No. 14, may appear deficient if compared to record

requirements under other Wage Orders but are nonetheless compliant. The Donohue Court did not have the need to address the interplay of the rebuttable presumption and Wage Order No. 14; that said, the Court finds that such a presumption would be warranted for records that, in fact, do violate Wage Order No. 14. This leads to the next issue the Court sees involving Plaintiff's argument.

Second, many of the records provided by Defendants do not on their face indicate non-compliance with Wage Order No. 14. Because Wage Order No. 14 does not require recording of "[m]eal periods during which operations cease and authorized rest periods," not all of the records Plaintiff relies upon appear on their face to be in non-compliance with Wage Order No. 14. Indeed, many of the records appear to include a notation of a "15/30/15" box with checkmarks, which Defendants' evidence explains are affirmative notations of rest and meal periods. Thus, this cuts against Plaintiff's argument that Woolfson's report 'found' 19,363 shifts, affecting 1,051 employees, that demonstrated meal break violations because Woolfson looked only to numerically entered meal breaks when such an entry is not necessarily required under Wage Order No. 14.

With the foregoing in mind, the Court is not persuaded that the Donohue presumption is triggered here.[5] Plaintiff offered no authority on the interplay between Donohue and Wange Order No. 14. Furthermore, the Court finds that the reasoning undergirding Donohue supports this finding: "The presumption derives from an employer's duty to maintain accurate records of meal periods." In the context of Wage Order No. 14, Plaintiff has not demonstrated that Grow Smart's records do not comply with its duty to maintain accurate records of meal periods.

In her reply, Plaintiff makes an argument that strains credulity. Plaintiff contends Defendants' argument regarding the requirements of Wage Order No. 14 only "confirms the existence of common questions suitable for class treatment." (ECF No. 64, p. 7.) To start, Plaintiff notes that some of Defendants' records do include recorded, numerically entered meal breaks. Plaintiff ponders why Defendants would have some records with recorded meal breaks

[5] Or if it were triggered, Plaintiff has not delineated which records meet Wage Order No. 14 and which records do not.

but not others. Yet, this is of no moment for at least two reasons. First, while an employer under Wage Order No. 14 is not required to record meal breaks when operations cease, nothing necessarily would prevent an employer from recording such a break in any event. Second, as the recording meal breaks exemption applies only when operations cease, an employer otherwise is required to record meal breaks. At the risk of sounding obvious, it appears that, as Defendants' have proffered, Grow Smart had various third-party contractees who used Grow Smart employees in various ways (including piece-rate and hourly employees) and kept differing timekeeping records accordingly. Therefore, records for employees working piece-rate might look different than records from hourly employees. Thus, the Court is puzzled by Plaintiff's observation.

Plaintiff then speculates that operations cannot "cease" should even one employee continue to work *even if* every other person and machine halts, meaning recording of meal breaks would be required. Even assuming this were true (Plaintiff provides no authority), Plaintiff has offered no precedent or evidence to demonstrate this point nor that this *actually occurred here*. Again, Plaintiff must prove that she meets the requirements of Rule 23 by a preponderance of the evidence, not by conjecture.

Next, Plaintiff seemingly tries to force the Court's hand, arguing that either Defendants maintained a uniform policy which would support commonality or that without a uniform policy, it must be assumed that Defendants did not truly cease operations meaning the record keeping exemption under Wage Order No. 14 does not apply. (ECF No. 64, p. 8.) Yet, as explained above, this choice is illusory because Plaintiff has failed to meet *her* burden for this type of theory (*i.e.*, if there were a policy, Plaintiff needed to provide evidence of one for this motion).

Plaintiff's final gambit is to try and expand the pie. Instead of homing in on commonality to her meal break claims, Plaintiff offers that:

> Defendants appear to contend that employees were expected or permitted to continue working until operations ceased before taking meal periods. Whether such a practice complies with California meal period requirements is not an individualized inquiry. It is a single legal question that applies equally to all class members subject to the practice. Whether Defendants maintained a common policy of ceasing operations is likewise a common

factual question capable of class-wide resolution.

(ECF No. 64, p. 8.) This fails to persuade as well. Defendants have never proffered that all employees were expected or permitted to continue working until cease operations before taking meal breaks. Rather, Defendants have descriptively outlined how some third-party contractees use the employees routed from Grow Smart. Moreover, Plaintiff's offered legal question appears to have already been answered by Wage Order No. 14 itself. In any event, and again, Plaintiff offers no evidence to support any uniform policy employed by Defendants as to cease work practices or that such a practice would be contrary to law.

Finally, Defendants' contend that Plaintiff's theory depends on at least some uniformity as to Grow Smart's workforce. (ECF No. 63, p. 8.) Yet, as demonstrated by Defendants' evidence, employees worked different jobs, for different contractees, at different locations, under different supervisors, under different pay methods, and with different types of time records. (ECF No. 63-6, Arellano-Moya Decl., ¶¶ 5, 17-18, 25; ECF No. 63-11; ECF No. 63-15, Torres Decl., ¶¶ 4-7, 13; ECF No. 63-14, Fuentes Decl., ¶¶ 4-5.) Further, the parties agree that most Grow Smart employees were paid hourly, and only approximately 15 to 20 percent of Grow Smart's workforce worked piece-rate. (ECF No. 63-6, Arellano-Moya Decl., ¶ 6; ECF No. 63-14, Fuentes Decl., ¶ 5; ECF No. 63-4, Ruiz Depo. 30:2-5.) With that, the Court finds that Plaintiff has not sufficiently demonstrated that, given these realities, that common questions of law or fact exist. For example, the records capturing work and meal break periods appear to differ between hourly employee and piece-rate employees, which seemingly begs different, albeit related, types of legal and/or factual questions. Simply raising that there might be a common question of whether meal breaks were afforded generally is not enough. See Wal-Mart, 564 U.S. at 349-50 ("Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,' Falcon, supra, at 157, 102 S. Ct. 2364. This does not mean merely that they have all suffered a violation of the same provision of law."). Thus, this argument by Defendants is well-taken.

The above were the only arguments Plaintiff raised in support of her contention that she has proven, by a preponderance of the evidence, that she has demonstrated commonality as to

her meal period claims. In light of the foregoing, the Court finds that Plaintiff has not met her burden of demonstrating commonality under Rule 23(a) for her meal break claims.[6]

**b. Commonality: Piece-Rate Claims**

Turning to her piece-rate claims, Plaintiff's only argument is "[a]s to the piece-rate subclass common legal and factual issues likewise predominate (*i.e.*, whether Grow Smart paid separately for rest periods and non-productive time in a manner consistent with Labor Code § 226.2)." (ECF No. 62, p. 9.) Plaintiff makes no citation to evidence or precedent. Again, Rule 23 is **not** a pleading standard. And in this Circuit, "plaintiffs must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." Olean, 31 F.4th at 665. Plaintiff's reply did not otherwise direct the Court to proof. Thus, the Court finds Plaintiff has failed from the outset to meet her burden at demonstrating to the Court that she has met commonality as to her piece rate claims.

In any event, the Court again agrees with Defendants that Plaintiff's general reliance on payroll and timekeeping records does not cure the problem here. The records themselves vary by assignment, contractee, type of work, pay method, and pay period. (ECF No. 63-6, Arellano-Moya Decl., ¶¶ 17-18, 23; ECF Nos. 63-11, 63-12; ECF No. 63-15, Torres Decl., ¶¶ 4-7; ECF No. 63-14, Fuentes Decl., ¶¶ 4-8.) Some assignments used crew timecards, while others used individual timecards. (ECF No. 63-6, Arellano-Moya Decl., ¶¶ 17-18; ECF No. 63-11; ECF No. 63-15, Torres Decl., ¶ 6.) Some records contain crew-level break and meal-period notations, while others include individual start times, stop times, meal entries, and employee signatures. (ECF No. 63-6, Arellano-Moya Decl., ¶¶ 17-18, 22; ECF No. 63-11; ECF No. 63-15, Torres Decl., ¶ 6.) Thus, the records alone do not apparently supply one uniform legal or factual answer; rather it appears that they require context based on the nature of the work performed by each employee for each assignment. Plaintiff did not directly rebut this reality. Therefore, the Court finds that Plaintiff has not met her burden of demonstrating commonality under Rule 23(a) for her piece-rate claims

---

[6] Plaintiff's explanation in her reply on how the Donohue rebuttable presumption works in California jury instructions, while informative, is unhelpful to the issue of commonality. (ECF No. 64, pp. 5-6.)

Because Plaintiff's other claims seemingly rise and fall with her meal break and piece-rate claims (see ECF No. 62, p. 9; ECF No. 63, pp. 17-19; ECF No. 64, p. 10), commonality as to these claims likewise fails.[7]

### 3. Typicality

To demonstrate typicality, a plaintiff "must show that the named parties' claims are typical of the class." Ellis v. Costco Wholesale Corp., 657 F.3d 970, 984 (9th Cir. 2011), citing Fed. R. Civ. P. 23(a)(3). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" Id., quoting Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." Id., quoting Hanon, 976 F.2d at 508.

For typicality, Plaintiff's opening argument is the following:

> Plaintiff's claims are reasonably coextensive with those of the class members. Plaintiff suffered the same meal period and piece-rate violations as the class and subclasses she seeks to represent. Reyes Decl. ¶¶ 4-9; Woolfson Decl. ¶ 50. Her interest in remedying these violations therefore aligns with the class. Therefore, Plaintiff satisfies the typicality requirement of Rule 23(a)(3).

(ECF No. 62, p. 11.)

Defendants counter that Plaintiff's case does not meet the typicality requirement because her employment was not typical of the class, Defendants have a unique defense against her, and Plaintiff is not typical of employees who worked under later enacted polices (including a mandatory arbitration agreement). (ECF No. 62, pp. 9-13.) The Court takes each of Defendants' arguments in turn.

#### a. Whether Plaintiff is Typical of the Class

Defendants first observe that Plaintiff worked only eight shifts in August 2023, all for one contractee, Five Diamond, in Delano, California, and was paid on a piece-rate basis. (ECF

[7] Because this is a findings and recommendations, the Court reaches the parties' remaining arguments notwithstanding that the commonality deficiency alone dooms Plaintiff's motion for class certification.

No. 63-6, Arellano-Moya Decl., ¶¶ 7, 14; ECF No. 63-14, Fuentes Decl., ¶ 10; ECF No. 62-4, Reyes Decl., ¶¶ 2-3, 6; Woolfson Report, ¶ 50.) Plaintiff worked on only a grape-related piece-rate assignment. (ECF No. 63-3, Arellano-Moya Decl., ¶ 7; ECF No. 62-4, Reyes Decl., ¶¶ 2-3, 6.) Plaintiff did not work across Grow Smart's different contractees, locations, job duties, supervisors, pay methods, or timekeeping systems. (Id.) From approximately August 2023 through October 2023, Grow Smart assigned about 60 employees to work at Five Diamond, all of whom were paid on a piece-rate basis. (ECF No. 63-6, Arellano-Moya Decl., ¶ 8; ECF No. 63-14, Fuentes Decl., ¶ 10.)

In contrast, Defendants, similar to their commonality argument, argue that Plaintiff seeks to certify a global class and subclasses beyond her own employment experience with Grow Smart. As discussed above, Grow Smart employees worked different jobs, for different contractees, at different locations, under different supervisors, under different pay methods, and with different types of time records. (ECF No. 63-6, Arellano-Moya Decl., ¶¶ 5, 17-18, 25; ECF No. 63-11; ECF No. 62-15, Torres Decl., ¶¶ 4-7, 13; ECF No. 63-14, Fuentes Decl., ¶¶ 4-5.) Defendants thus argue that Plaintiff seeks to represent hourly employees despite only working on a piece-rate basis, employees assigned to contractees other than Five Diamond even though she never worked for those contractees, and employees working under different supervisors and timekeeping systems that she never experienced.

In her reply, Plaintiff argues that notwithstanding Defendants' argument, Plaintiff was subject to the same alleged unlawful meal period, wage, and compensation practices challenged on behalf of the class. (ECF No. 64, p. 3.) Plaintiff continues, arguing that because she worked for only Five Diamond or only on a piece-rate basis does not mean her claims are atypical. (Id.) The Court disagrees. Defendants, and Plaintiff, have provided evidence of different third-party contractees using Grow Smart employees for different types of work with different recording requirements and different timekeeping recording systems. Simply because Plaintiff was allegedly denied meal and rest breaks generally does not mean that her claims are necessarily typical of every employee, hourly or piece-rate, who worked or works for Grow Smart. Specifically, Plaintiff was hired and worked as a piece-rate employee and has not otherwise

connected the dots that her claims would be typical to, for example, an hourly rate employee who was hired to work for eight-hour shifts who was not afforded a lunch and whose time sheet is different from her own. Plaintiff's response to this is that at a minimum, she has established a *prima facie* showing that her claims are typical. But that is not the standard. Plaintiff is required to *prove* that her claims are typical by a preponderance of the evidence. The Court finds that Plaintiff has not done so generally.

**b. Whether Defendants Have a Unique Defense Against Plaintiff**

Directly related to the above findings is that Defendants argue that Plaintiff meal break claims are subject to a defense unique to Plaintiff. (ECF No. 63, p. 11.) Succinctly, Defendants contend that Plaintiff's timekeeping records (ECF No. 63-9) demonstrate that Plaintiff worked eight shifts, all for not more than five hours a day. Because California requires a meal break only when an employee has worked more than five hours a day, Defendants offer that they have an affirmative defense against Plaintiff's meal break claims. (Id.) In other words, before Plaintiff could represent any meal-period subclass, the Court would first have to resolve a plaintiff-specific dispute over whether Plaintiff herself worked shifts requiring meal periods at all. In the Ninth Circuit, "a named plaintiff's motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." Hanon v. Dataproducts, Corp., 976 F.3d 497, 508 (9th Cir. 1992) (internal quotation omitted).

Defendants argue that this defense is not incidental but goes to the heart of Plaintiff's ability to represent meal-period and auto-deduct subclasses. (Id.) Critically, should the Court later find in favor of Defendants for that defense, that would threaten those subclasses. In her reply, Plaintiff does not directly dispute this issue, but rather, she notes that Plaintiff's timekeeping records were not produced during phased discovery. Plaintiff protests to these records insofar as the records "lack [an] indicia of reliability" and that it would be unfair given the late disclosure. (ECF No. 64, p. 4.)

At the hearing the Court questioned Defendants on their apparent sandbagging of critical records—the named Plaintiff's time sheets—by including them only in their opposition when

non-expert discovery closed on December 29, 2025. (ECF No. 51.) Counsel responded that he had only recently joined the matter, and he proffered that in preparation of the opposition to the motion to certify class, he asked his clients if there was any other discovery and Plaintiff's time sheets were provided. Though the Court is aware that current counsel for Defendants came on in September 2025 (ECF No. 59), the Court cannot excuse the late disclosure by Defendants. Nor was counsel at the hearing able to point to any authority for allowing into the class certification record the late time sheets. Furthermore, the Court notes that it has previously had to intervene when Defendants dragged their feet in discovery production. (ECF Nos. 38, 41.)[8]

Therefore, the Court will disregard Plaintiff's time sheets (ECF No. 63-9). Because the time sheets are the basis for Defendants' proffered unique defense, the Court finds that Defendants have not demonstrated that Plaintiff is subject to such a defense.[9]

**c. Whether Plaintiff is Typical of Employees Subject to Later-Enacted Policies**

Defendants' last point regarding typicality involves their evidence demonstrating that beginning in September 2023, Grow Smart implemented new payroll and accounting systems to include separate break/rest pay for piece-rate workers, as well as in March 2024, Grow Smart implemented new written onboarding and policy acknowledgments from its employees that included an arbitration clause. (ECF No. 63, pp. 11-12.) Because Plaintiff did not work under these new practices, Defendants contend she cannot be said to be typical of any employee who is subject to the new accounting and written policies. Plaintiff responds that an arbitration agreement in and of itself is not dispositive of a motion for class certification. (ECF No. 64, p. 4.) The parties then address caselaw.

Plaintiff relies on Garcia v. Central Coast Restaurants, Inc., No. 18-cv-02370-RS, 2022 WL 657972 (N.D. Cal. Mar. 4, 2022); however, the Court finds Garcia inapposite. In Garcia, the plaintiff had signed an arbitration agreement but successfully challenged the agreement. The

[8] Plaintiff later filed a motion for sanctions regarding discovery production, but following briefing on the motion, Plaintiff withdrew her motion. (ECF Nos. 44, 47, 48, 49, 52.)

[9] The Court disregards Plaintiff's time sheets only for purposes of this motion.

district court observed that the Ninth Circuit had held "that a plaintiff who had opted out of an arbitration clause could not lead a class of people who had not opted out." Id. at *4. But the Garcia court was quick to note that that was not the case before it and found that the plaintiff could represent class members who were subject to the same faulty agreement. The only other relevant precedent the district court distinguished involved a case where a plaintiff had not assented to the arbitration agreement. Id. at *5, citing Andrews v. Ring, No. 5:20-cv-00889-RGK-SP, 2020 WL 6253319 (C.D. Cal. Sept. 17, 2020). The Garcia court noted that while the plaintiff in that case was not bound to the arbitration agreement because he had not assented to the agreement, he could not be a lead plaintiff for a class that was subject to such an agreement. Id. Ultimately, the district court granted in part and denied in part the plaintiff's motion for class certification. Id. at *8.

With this background (not provided to the Court), Plaintiff directs the Court to an October 28, 2022 order where the Hon. Richard Seeborg denied the Garcia defendants cross motion to modify the class based on the arbitration agreement. Id., ECF No. 121 (N.D. Cal. Oct. 28, 2022). The district court observed that while there was an issue of whether the arbitration agreement was, as a matter of law, valid as to all class members, "at this stage the class has been defined properly." Id. The district court noted that should the plaintiff fail to prove the invalidity of the arbitration agreement generally, the defendants remained free to move for proper relief. Id.

While informative on some of the background involving arbitration agreements and how they can intersect with class certification, Garcia offers little to Plaintiff's position. Rather, Plaintiff seemingly notes that Garcia is an example where an arbitration agreement may not necessarily defeat a motion for class certification. While true, the facts in Garcia (and the cases discussed therein) are vastly different from the case at bar. Here, Plaintiff was never subject to an arbitration agreement; however, beginning in March 2024, all employees who work for Grow Smart were. Because Plaintiff is not bound to the arbitration agreements, she may not represent a class that is bound to such an arbitration agreement. See Lawson v. Grubhub, Inc., 13 F.4th 908, 913 (9th Cir. 2021). Those employees are subject to defenses and class-structure issues that

Plaintiff does not share and cannot litigate as her own. See id.

Meanwhile, Defendants have directed the Court to Avilez v. Pinkerton Government Servs., Inc., 596 Fed. Appx. 579 (9th Cir. 2015) (mem.), which the Court finds is instructive. In Avilez, the district court certified classes and subclasses that included employees who signed class action waivers despite the named plaintiff not signing a class action wavier. Id. at 579. Indeed, the plaintiff conceded that "those who signed such waivers have potential defenses that [the plaintiff] would be unable to argue on their behalf." Id. The Ninth Circuit determined that the district court had abused its discretion in certifying the classes and subclasses to the extent they included individuals who signed class action waivers. Id. The Court observed that the plaintiff was not an adequate representative and that her claims lacked typicality. Id.; see also Cornejo v. Big Lots Stores, Inc., No. 2:22-cv-01247-MCE-DB, 2023 WL 3737058, at * (E.D. Cal. May 31, 2023), citing Avilez.

In light of the foregoing, the Court finds that Plaintiff is not typical of any Grow Smart employees who signed an arbitration agreement beginning in March 2024.

**4. Adequacy**

Plaintiff argues that she has no conflict and that her counsel is qualified to represent the class. (ECF No. 62, p. 12) Defendants did not dispute this aspect of adequacy and addressed it only as to its intertwining with typicality and arbitration agreements. (ECF No. 63, p. 12.)

The last requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To satisfy constitutional due process concerns, absent class members must be afforded adequate representation before entry of a judgment which binds them." Hanlon v. Chrysler Corp., 150 F.3d 1011, (9th Cir. 1998), *overruled on other grounds by* DZ Reserve v. Meta Platforms, Inc., 96 F.4th 1223 (9th Cir. 2024); see Hansberry v. Lee, 311 U.S. 32, 42-43 (1940). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" Id., citing Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978).

Because Plaintiff has not demonstrated that she is generally typical of the class, she is likewise not adequate generally. Relatedly, having found that Plaintiff's claims are not typical of class members who signed arbitration agreements beginning in March 2024, the Court also finds that Plaintiff is not adequate to represent the interests of these employees. That said, to the extent any class or subclass might survive the Court's analysis above, the Court finds that Plaintiff otherwise does not have a conflict and Plaintiff's counsel appears to be adequate. (ECF No. 62, p. 12, citing 62-1, Mallison Decl., ¶¶ 2-4, 11.)

* * *

In sum, the Court finds that while Plaintiff has demonstrated numerosity, she has not demonstrated commonality as to all claims. Further, Plaintiff has not demonstrated typicality as to all claims, as well as typicality and adequacy for employees with Grow Smart after March 2024 who signed arbitration agreements. Plaintiff has otherwise demonstrated adequacy. For these reasons alone, the Court will recommend denying Plaintiff's motion.[10]

**D. Rule 23(b) Requirements**

In addition to meeting the requirements of Rule 23(a), a party moving for class certification must meet at least one requirement from Rule 23(b). Here, Plaintiff argues that she has met Rule 23(b)(2) and (b)(3). The Court disagrees.

**1. Rule 23(b)(2)**

Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Wal-Mart, 564 U.S. at 360. In Wal-Mart, the Supreme Court held that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." Id. "Similarly, it does not authorize class certification when each class member would be entitled to an individualized

[10] Because the Court will recommend that Plaintiff's motion be denied for a variety of reasons, the Court need not address Defendants' alternative argument that any certified subclass be narrowed. (ECF No. 63, pp. 15-16.)

award of monetary damages." Id. at 360-61.

Plaintiff argues that because Grow Smart has acted generally toward the class and subclasses by failing to provide compliant meal periods, auto-deducting meal periods, and failing to pay piece-rate employees separately for rest periods and other non-productive time, she had met Rule 23(b)(2). (ECF No. 62, p. 12.)

Yet, as Defendants point out, Plaintiff appears to eschew the Supreme Court's decision in Wal-Mart barring class certification under Rule 23(b)(2) "when each class member would be entitled to an individualized award of monetary damages." 564 U.S. at 360-61. Plaintiff unequivocally seeks "compensatory damages including wages in an amount according to proof with interest thereon" for Plaintiff and class members. (ECF No. 30, p. 31.) Assuming Plaintiff's case were successful, Plaintiff's own evidence demonstrates that each class member would necessarily be entitled to an individualized award of monetary damages based on the different types of violations and number of occurrences (*i.e.*, meal-period premiums, unpaid wages, wage-statement penalties, waiting-time penalties, and UCL restitution).

Moreover, because Defendants have provided evidence that beginning in March 2024 all Grow Smart employees are subject to an arbitration agreement, it does not appear that a single injunction or declaratory judgment would resolve issues on a class-wide basis. And again, Grow Smart employees worked for different third-party contractees, at different worksites, under different supervisors, using different timekeeping formats, and under different pay methods. (ECF No. 63-6, Arellano-Moya Decl., ¶¶ 5-6, 17-18, 25; ECF No. 63-11; ECF No. 63-15, Torres Decl., ¶¶ 4-7, 13-17; ECF No. 63-14, Fuentes Decl., ¶¶ 4-5.) Any forward-looking relief would seemingly have to account for different assignments, pay systems, recordkeeping practices, policy periods, and arbitration agreements applicable to employees hired in and after March 2024.

Plaintiff did not respond to Defendants' Rule 23(b)(2) argument in her reply, and at the hearing, Plaintiff confirmed that she seeks damages on behalf of herself and the class. Thus, it appears that Rule 23(b)(2) is not appropriate for class certification in this matter. Wal-Mart, 564 U.S. at 360-61. The Court finds that Plaintiff has not demonstrated that she meets Rule

23(b)(2)'s requirements.

**2. Rule 23(b)(3)**

To qualify under Rule 23(b)(3), a district court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Olean, 31 F.4th at 663-64, quoting Fed. R. Civ. P. 23(b)(3). "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." Tyson Foods, 577 U.S. at 453 (cleaned up). The requirements of Rule 23(b)(3) overlap with the requirements of Rule 23(a): the plaintiffs must prove that there are "questions of law or fact common to class members" that can be determined in one stroke, see Wal-Mart, 564 U.S. at 349, in order to prove that such common questions predominate over individualized ones. See Tyson Foods, 577 U.S. at 453-54. Therefore, courts must consider cases examining both subsections in performing a Rule 23(b)(3) analysis.

Plaintiff argues that "[t]his action also qualifies under Rule 23(b)(3), because questions of law or fact common to the members of the class predominate over any questions affecting only individual members, as explained above." (ECF No. 62, p. 13.) For "superiority," Plaintiff argues that

> This case presents no manageability difficulties that would preclude class certification. The case will be easily manageable at trial. After all, liability here hinges chiefly on Grow Smart's business records, as represented by electronic data. Facts reflected in those data will be established by limited expert testimony. Accordingly, there are no manageability concerns weighing against certification of this case as a class action.

(Id.)

The Court has found above that Plaintiff has not demonstrated commonality as to any claims. Defendants rehash predominance by reiterating their commonality argument regarding Rule 23(a). (ECF No. 63, pp. 13-15.) The Court agrees. Because the Court has already found that commonality is lacking in this case, by definition there are no common, aggregation-enabling, issues to predominate.

For superiority, Defendants raise again that the timekeeping records in this case require context. (Id. at p. 19.) Grow Smart used different types of time records, including crew timecards and individual timecards; employees worked for different contractees, at different locations, under different supervisors, and under different pay methods; and payroll and wage-statement practices changed during the proposed class period. (ECF No. 63-6, Arellano-Moya Decl., ¶¶ 5-6, 17, 23-25; ECF No. 63-15, Torres Decl., ¶¶ 4-7, 14-17.)

Defendants continue, arguing that,

> Plaintiff has not identified a workable classwide method for resolving those issues. For meal-period and alleged auto-deduct claims, the Court would need to determine whether each employee worked a meal-eligible shift, whether the employee worked in a crew or individual assignment, whether operations ceased for the crew, whether a "15/30/15" notation reflected provided breaks, whether a meal period was actually provided, and what each record format means in context. For piece-rate, wage-statement, waiting-time, and UCL claims, the Court would need to determine the employee's pay method, assignment, pay period, wage-statement format, and whether the alleged violation occurred before or after Grow Smart's September 2023 payroll update.

(Id.) In other words, "Plaintiff's proposed classes would require individualized inquiries into assignments, worksites, supervisors, timekeeping formats, pay methods, and pay periods, class treatment is not superior to other available methods and would not fairly or efficiently adjudicate the controversy." (Id. at p. 20.)

Plaintiff did not address Defendants' Rule 23(b)(3) argument in her reply. At the hearing, Plaintiff argued that this case is simple, and that for trial, Plaintiff would rely on Defendants' business records, Plaintiff's expert, and Plaintiff's testimony for her case-in-chief. In other words, it appears that Plaintiff stands on her briefing.

With that, the Court agrees with Defendants that Plaintiff has not met her burden of demonstrating that class certification would be superior, in particular because Plaintiff has not shown that liability can be tried through common proof. Plaintiff has not explained how she could use Defendants records without incorporating the context of Wage Order No. 14 and the content of the records themselves, which some include "15/30/15" boxes with check marks, indicating rest and meal periods. In other words, while some records may demonstrate non-

compliance with Wage Order No. 14 based on numerically entered time, others may not. And Plaintiff has not persuasively accounted for this to the Court. Therefore, Plaintiff has not met her burden under Rule 23(b)(3).

Accordingly, the Court finds that Plaintiff has not demonstrated that she meets Rule 23(b)(2) or 23(b)(3)'s requirements.

* * *

In sum, the Court finds that Plaintiff has demonstrated by preponderance of the evidence that she has met numerosity and certain aspects of adequacy. However, Plaintiff has otherwise failed to demonstrate commonality, typicality, other aspects of adequacy under Rule 23(a). Plaintiff has also failed to demonstrate that she meets the requirements under Rules 23(b)(2) and Rule 23(b)(3). For these reasons, the Court will recommend denying Plaintiff's motion to certify class.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**IV.**

**CONCLUSION AND RECOMMENDATION**

For the foregoing reasons, the Court hereby RECOMMENDS that Plaintiff's motion to certify class (ECF No. 62) be DENIED.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304. Within **fourteen (14) days** of service of this recommendation, any party may file written objections to these findings and recommendations with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014), citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991).

Following the District Judge's determination on whether to adopt, modify, or reject these findings and recommendations, the Court will set a scheduling conference in order to discuss a subsequent scheduling order.

IT IS SO ORDERED.

Dated: **July 21, 2026**

STANLEY A. BOONE
United States Magistrate Judge